## IN THE UNITED STATES DISTRICT COURT
### FOR THE WESTERN DISTRICT OF OKLAHOMA

**RICHARD MAYS and SHERI MAYS,**
**Individuals; and MAYS SERVICE, INC.,**
**an Oklahoma Corporation,**

      **Plaintiffs,**

**v.**                                 **Case No. 16-cv-996-G**

**LIBERTY MUTUAL FIRE**
**INSURANCE COMPANY,**

      **Defendant.**

### DEFENDANT LIBERTY MUTUAL FIRE INSURANCE COMPANY'S
### MOTION FOR SUMMARY JUDGMENT AND BRIEF IN SUPPORT

Respectfully submitted,

**HALL, ESTILL, HARDWICK, GABLE,**
**GOLDEN & NELSON, P.C.**

William W. O'Connor, OBA No. 13200
Margo E. Shipley, OBA No. 32118
320 South Boston Avenue, Suite 200
Tulsa, OK  74103-3706
Telephone:  (918) 594-0400
Facsimile:  (918) 594-0505
Email: boconnor@hallestill.com
Email: mshipley@hallestill.com

**ATTORNEYS FOR DEFENDANT,**
**LIBERTY MUTUAL FIRE INSURANCE**
**COMPANY**

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ........................................................................................................ 1

STATEMENT OF UNDISPUTED FACTS ............................................................... 5

    The Policy ............................................................................................................. 5

    The Fire ................................................................................................................. 5

    Mays Service, Inc. ............................................................................................... 5

    Plaintiffs Mays' Dwelling Claim ........................................................................ 5

    Plaintiffs Mays' Personal Property Claim ........................................................... 5

    Plaintiffs Mays' ALE Claim ................................................................................ 5

    Plaintiffs Resurface Four Years Later ............................................................... 14

    Plaintiffs' Supplemental Dwelling Invoices ..................................................... 16

    Plaintiffs Mays' Supplemental Personal Property Invoices .............................. 17

    Plaintiffs' Credibility ........................................................................................ 17

    Plaintiffs Mays' Allegations of "Bad Faith" .................................................... 18

    Defendant's Claims Handling Expert Diane Luther .......................................... 19

    Defendant's Construction and Damages Expert, Michael J. Berryman ............. 21

SUMMARY JUDGMENT STANDARD ................................................................. 22

ARGUMENT AND AUTHORITY .......................................................................... 24

    I.     Plaintiffs Mays' Claim for Breach of Contract Should be
            Disposed of by Summary Judgment as This Claim is
            Time-Barred and Without Merit ............................................................. 24

            A.     Plaintiffs' Mays Claim for Breach of Contract is Time-Barred ....... 24

            B.     Plaintiffs' Mays Claim for Breach of Contract is

i

Substantively Meritless ................................................................. 26

    i.    Summary Judgment on Plaintiffs Mays' Dwelling
        Claim is Appropriate .................................................. 26

    ii.   Summary Judgment on the Personal Property
        Claim is Appropriate .................................................. 28

    iii.  Summary Judgement on Plaintiffs Mays' ALE
        Claim is Appropriate .................................................. 28

II.    Summary Judgment on Plaintiffs Mays' Claim for Breach of
      Duty of Good Faith and Fair Dealing is Proper as This Claim
      Is Also Time-Barred and Unsupported by the Record Evidence ............... 29

    A.    Plaintiffs Mays' Bad Faith Claim is Time-Barred .......................... 29

    B.    Plaintiffs Mays' Have Presented No Evidence that
        Liberty Mutual Acted in Bad Faith .................................... 30

    C.    Plaintiffs' Bad Faith Claim is Unsupportable Because
        Liberty Mutual Acted Reasonably .................................... 31

    D.    Liberty Mutual's Conduct Was Not the Direct Cause
        Of Injury .......................................................... 34

III.   Plaintiff Mays Service's "Claim" for Breach of Contract Should
      Be Disposed of by Summary Judgment as Such Claim is Time-Barred
      And Plaintiff Mays Service Never Entered Into a Contract
      With Defendant ..................................................... 34

    A.    Plaintiff Mays Service's Breach of Contract Claim
        Is Time-Barred .................................................... 35

    B.    Mays Service Never Entered Into a Contract with
        Liberty Mutual ..................................................... 35

IV.   Liberty Mutual Respectfully Seeks Summary Judgment on the
      Issue of Punitive Damages ............................................ 35

CONCLUSION ............................................................... 36

# TABLE OF AUTHORITIES

## CASES

*Adler v. Wal-Mart Stores, Inc.,* 144 F.3d 664 (10th Cir. 1998) ........................................ *23*

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242 (1986) ...................................................... 23

*Andres v. Okla. Farm Bureau Mut. Ins. Co.*, 2009 OK CIV APP 97
227 P.3d 1102 ................................................................................................................ 30, 32

*Beers v. Hillory*, 2010 OK CIV APP 99,
241 P.3d 285, 293 ................................................................................................................ 32

*Bennett v. Windstream Commc'ns, Inc.*, 30 F. Supp. 3d 1243
(N.D. Okla. 2014) ................................................................................................................ 23

*Blue v. Universal Underwriters Life Ins. Co.*, 612 F. Supp. 2d 1201,
1203 (N.D. Okla. Mar. 18, 2009) ........................................................................................ 29

*Breedlove v. Allstate Ins. Co.*, 73 Fed. Appx. 377
(10th Cir. Okla. Aug. 22, 2003)........................................................................................... 25

*Butterfly-Biles v. State Farm Life Ins. Co.*,
No. 09-CV-086-CVE-PJC, 2010 WL 346839 (N.D. Okla. Jan. 21, 2010) ........................ 29

*Caton v. State Farm Fire & Cas. Co.,*
No. CIV-06-1112-F, 2007 WL 2993869 (W.D. Okla. Sept. 19, 2007)............................... 24

*Celotex Corp. v. Catrett,* 477 U.S. 317 (1986)................................................................... 23

*Digital Design Grp., Inc. v. Info. Builders, Inc.*, 2001 OK 21,
24 P.3d 834 ..................................................................................................................... 26, 35

*Dunbar v. State Farm Mut. Auto. Ins. Co.*,
No. 10-CV-330-GKF-TLW, 2011 WL 5878383, (N.D. Okla. Nov. 23, 2011) ............... 32

*Gillham v. Lake Country Raceway*, 2001 OK 41, 24 P.3d 858 ......................................... 34

*Hayes v. State Farm Fire & Cas. Co.*, 855 F. Supp. 2d 1291
(W.D. Okla. Jan. 24, 2012) ........................................................................ 24

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574 (1986) ............... 23

*McCorkle v. Great Atlantic Ins. Co.*, 1981 OK 128,
637 P.2d 583 ............................................................................................. 30

*McLaughlin v. National Benefit Life Ins. Co.*, 772 P.2d 383 (Okla. 1988) ...................... 36

*Miller v. Liberty Mut. Fire Ins. Co.*, 2008 OK CIV APP 65,
191 P. 3d 1221 .......................................................................................... 29

*Rodebush v. Okla. Nursing Homes*, 1993 OK 160, 867 P.2d 1241 ................................. 36

*Ryals v. State Farm & Cas. Co.*, No. 08-CV-91-JHP-FHM,
2008 WL 4542886 (N.D. Okla. Oct. 7, 2008) ................................................... 30

*Tomlinson v. Combined Underwriters Life Ins. Co.*, No. 08-CV-259-TCK-FHM,
2009 U.S. Dist. LEXIS 81897 (N.D. Okla. Sept. 9, 2009) .................................... 30

*Trinity Baptist Church v. GuideOne Elite Ins. Co.*, 654 F. Supp. 2d 1316
(W.D. Okla. Aug. 28, 2009) .......................................................................... 29

*Wagnon v. State Farm Fire & Cas. Co.*, 1997 OK 160 .............................................. 24

*Willis v. Midland Risk Ins. Co.*, 42 F.3d 607 (10th Cir. 1994) ................................ 35, 36

## STATUTES

OKLA. STAT. tit. 12 ....................................................................................... 4, 29

OKLA. STAT. tit. 23 ......................................................................................... 36

OKLA. STAT. tit. 36 ......................................................................................... 24

## **OTHER AUTHORITIES**

Fᴇᴅ. R. Cɪᴠ. P. 56 ............................................................................................. 1, 22

LCvR7.1 ........................................................................................................... 1

LCvR56.1 ......................................................................................................... 1

Pursuant to Rule 56 of the Federal Rules of Civil Procedure and Local Rules 7.1 and 56.1, Defendant Liberty Mutual Fire Insurance Company ("Liberty Mutual") respectfully requests that the Court enter summary judgment in its favor on the claims of Plaintiffs Richard Mays and Sheri Mays ("Plaintiffs Mays") for breach of contract and breach of the duty of good faith and fair dealing and the claim of Plaintiff Mays Service Inc. ("Plaintiff Mays Service") for breach of contract.[1]

## <u>INTRODUCTION</u>

This case arises from a fire that damaged Mr. and Mrs. Mays' residence on October 22, 2010.  At that time, Mr. and Mrs. Mays were in the process of extensive renovations to the home.  Mrs. Mays reported the claim the day of the fire.  Liberty Mutual's employees promptly inspected the residence, created an estimate, and issued an initial payment for Dwelling damages totaling $83,657.94 on November 23, 2010.  Liberty Mutual paid Mr. and Mrs. Mays benefits under their Additional Living Expense ("ALE") coverage so they could live at an alternate location for approximately six (6) months.  Liberty Mutual's adjusters also promptly issued Personal Property advances totaling $5,500.00 and requested that Mr. and Mrs. Mays supply an inventory of damaged or destroyed contents.

From the outset, this insurance claim was marked by the absence of cooperation and non-responsiveness of Mr. and Mrs. Mays, in derogation of their fundamental responsibilities under the Policy.  Mr. Mays is a contractor and operates his business through Plaintiff Mays Services.  Mr. Mays requested that he be allowed to complete the

---

[1] Plaintiffs Richard Mays, Sheri Mays, and Mays Service are referred to as "Plaintiffs." Plaintiffs Richard and Sheri Mays are, at times, referred to as "Mr. Mays" or "Mrs. Mays."

1

repairs to the residence.   At the time of Liberty Mutual's initial payment, Mr. Mays indicated he would supply additional bids for electrical, mechanical, and plumbing line-items.   Liberty Mutual's employees attempted to contact Mr. Mays on **nineteen (19) occasions** to obtain the promised additional bids.   Liberty Mutual's employees also contacted Plaintiffs Mays at least **twenty-one (21) times** regarding the requested Personal Property inventory, and even offered to assist with preparing a contents inventory onsite. Again, however, their efforts were to no avail.   Mr. and Mrs. Mays would promise that the bid items and inventory were being prepared and would be forthcoming, but time and again failed to fulfill these promises. In June of 2012, Mr. and Mrs. Mays' communications with Liberty Mutual ceased altogether.   For nearly four (4) years, the Mays neither contacted Liberty Mutual nor responded to any of Liberty Mutual's repeated communication efforts.

In February of 2016, after four (4) years of silence, Mr. Mays contacted Liberty Mutual and demanded payment of additional invoices, including the electrical, mechanical, and plumbing bid items, which Liberty Mutual had never received.   Mr. Mays has since claimed he first supplied the invoices to Liberty Mutual in 2012, but there is absolutely no record evidence to support that assertion.   To the contrary, **the date of the serial number on the HVAC unit that Mr. Mays installed shows it was not manufactured until January of 2013**.   Mr. Mays finally mailed some "invoices" to Liberty Mutual in July or August of 2016.   The invoices—most of which Mr. Mays created—contain line-items that are inflated, unsupportable, or related to the Mays' extensive remodel of their home rather than to the fire loss.   Of course, there are no source documents underlying the ostensible invoices, e.g., there are no timecards nor any invoices for what Mr. Mays paid for the

HVAC units, piping, or duct work.  Documentation from the City of Oklahoma City establishes that Mr. Mays did not obtain a building permit to restore the fire damage, and a final inspection has not occurred for the building, electrical, or plumbing permits.  The City has not issued a Certificate of Occupancy, and the required HVAC permit is not on record.  Mr. and Mrs. Mays did not supply a Personal Property inventory or supporting documentation until June 8, 2017, during the course of written discovery in this litigation.

Plaintiffs filed this lawsuit on August 9, 2016.  The Mays assert claims for breach of contract and bad faith.  Additionally, Plaintiff Mays Service asserts a "claim" for breach of contract.  The Mays have been unable to articulate any "bad faith" by Liberty Mutual:

| | |
|---|---|
| Q (Mr. O'Connor): | What else—what else do you think Liberty Mutual did wrong? |
| A (Mr. Mays): | I can't answer that right now. |

Exhibit 1, at p. 254.

***

| | |
|---|---|
| Q (Ms. Shipley): | Mrs. Mays, what damages are you claiming in this lawsuit? |
| A (Mrs. Mays): | I guess that it didn't ever get completed.  I don't know what numbers, I don't know—I don't know.  I'm just not involved in it.  We are—you don't know us.  We are very old-fashioned.  He takes care of this, I take care of the laundry and the kids and the food.  I don't know, really, anything about—I can't dispute this stuff, but I really—this is not my milieu. |

Exhibit 2, at p. 69.

Liberty Mutual respectfully submits that Plaintiffs' claims are fundamentally without merit, and summary judgment is appropriate.  Given that Plaintiffs filed suit nearly six (6) years after the date of loss, Plaintiffs' breach of contract claims are plainly barred

by the Policy's one-year limitations period.[2]  Mr. and Mrs. Mays' claim for breach of contract is also fundamentally flawed because the stale invoices are inflated, unsupported, and not within industry standards.  Mays Service's "claim" for breach of contract is meritless because "Mays Service, Inc." did not exist in 2010 when the fire occurred and the repairs commenced.  As such, Mays Service could not and did not enter into a contract with Liberty Mutual; rather, the only contract at issue here is Mr. and Mrs. Mays' insurance Policy.  Mr. and Mrs. Mays' claim for breach of the duty of good faith and fair dealing is, likewise, time-barred by Oklahoma's two-year limitations period.  In addition to being time-barred, the bad faith claim is also substantively meritless, as Plaintiffs Mays have presented absolutely no evidence of bad faith.

Indeed, Judge Friot previously dismissed Plaintiffs' claims as time-barred but allowed Plaintiffs leave to amend their Complaint to support tolling or waiver of the limitations period.  (Doc. No. 12).  Plaintiffs then filed an Amended Complaint, which added numerous factual allegations that are unsupported and unsupportable, in an attempt to show tolling.  (Doc. No. 13).  On January 18, 2017, the Court entered an Order allowing this action to proceed, but did not foreclose the possibility that Liberty Mutual could seek summary judgment.  (Doc. No. 17).  Liberty Mutual now submits that the undisputed record evidence demonstrates that Plaintiffs' claims are time-barred, and Liberty Mutual

---

[2] Even if the Policy did not contain a one-year limitations period, the breach of contract claims would still be barred by Oklahoma's five-year statute of limitations for written contracts. OKLA. STAT. tit. 12, § 95(A)(1).

has not breached the contract of insurance or acted in bad faith. Accordingly, Liberty Mutual respectfully submits that summary judgment in its favor is proper.

## STATEMENT OF UNDISPUTED FACTS

### -The Policy-

1.      Plaintiffs Mays are husband and wife who have a homeowners' Policy of insurance with Liberty Mutual. *See* Exhibit 1, Deposition of Richard Mays, at pp. 11, 43; Exhibit 2, Deposition of Sheri Mays, at p. 19.

2.      Plaintiffs Mays' Policy was renewed on August 24, 2010, and was effective on the date of the subject fire loss. *See* Exhibit 3, Policy, at LMFIC 000307.

3.      Each time their Policy was renewed, Mr. and Mrs. Mays received a copy and had an opportunity to review it.  Exhibit 1 at p. 78, Exhibit 2 at pp. 19-20.

4.      Mr. and Mrs. Mays agree they have duties under the Policy, including the duty to give prompt notice of any losses; to prepare an inventory of damaged personal property and to attach related documents; to show the damaged property; to provide Liberty Mutual with records and documents that it requests; and to provide a signed and sworn Proof of Loss within sixty (60) days after a request by Liberty Mutual.  Exhibit 1 at pp. 84-85; Exhibit 2 at pp. 22-26; *see also* Exhibit 3 at p. LMFIC 000013-14.

5.      Mr. and Mrs. Mays agree that the Policy provides, **"[n]o action can be brought unless the policy provisions have been complied with and the action has started within one year after the date of loss."**  Exhibit 1 at p. 85; Exhibit 2 at pp. 26-27; *see also* Exhibit 3 at p. LMFIC 000015 (emphasis added).

6.      Mr. Mays testified that no one at Liberty Mutual ever told the Mays that this limitation period in the Policy was waived or did not apply.  Exhibit 1 at pp. 185-186.

7.      Mr. Mays testified that no one at Liberty Mutual ever told Plaintiffs Mays that the claim would be paid regardless of how long it took them to submit invoices and inventories to Defendant.  Exhibit 1 at p. 186.

*-The Fire-*

8.      On October 22, 2010, Plaintiffs Mays' residence was damaged by fire caused by a lightning strike.  Exhibit 1 at pp. 85-86.  The fire created a hole in the roof and damaged the upstairs.  Exhibit 1, at pp. 86-87.

9.      That day, Liberty Mutual set up emergency mitigation services, authorized rental of a generator, and set up alternate living accommodations ("ALE").  Exhibit 1 at pp. 92-94; Exhibit 2 at p. 36; *see also* Exhibit 4, Claim File, at LMFIC 000274-275.

10.      Liberty Mutual also sent a third-party, Covenant, to cover the roof with a tarp.  Exhibit 4, at LMFIC 000274; Exhibit 2 at p. 31.

*-Mays Service, Inc.-*

11.      Plaintiff Richard Mays is a contractor.  Exhibit 1, at p. 9.

12.      Plaintiff Richard Mays incorporated Plaintiff "Mays Service Inc." in January 2014.  Exhibit 1, at p. 9; Exhibit 5, Secretary of State Document.

13.      Plaintiff Richard Mays is the sole owner, sole officer, and sole director of Plaintiff Mays Service.  Exhibit 1 at p. 70.

14.      Plaintiff Richard Mays performs plumbing, mechanical, and electrical work on residential and commercial properties.  Exhibit 1, at pp. 62, 71.

15.     Plaintiff Richard Mays testified that through his work with Plaintiff Mays Service, he timely submits invoices for his work.  Exhibit 1 at p. 78.

16.     When the fire occurred, Mr. Mays was in the process of completing extensive renovations and remodeling to the subject residence.  Exhibit 1 at pp. 213-214.

17.     These renovations included remodeling the living room, moving the kitchen to the former den, installing an elevator, refiguring two bedrooms, moving the location of the front door, adding a master closet, adding a mother-in-law suite, and moving the outside condensers to allow for a glass enclosure of the patio.  Exhibit 1 at pp. 214-216.

*-Plaintiffs Mays' Dwelling Claim-*

18.     Michael Vickerman ("Vickerman") was the Liberty Mutual adjuster assigned to Plaintiffs Mays' Dwelling claim.  Exhibit 4 at LMFIC 000274; Exhibit 1 at p. 100.

19.     Mr. Mays testified he did not have any issues or problems with Vickerman, and that Vickerman was responsive to Plaintiffs' needs.  Exhibit 1 at pp. 101, 116.

20.     On October 26, 2010, Vickerman inspected the residence.  Exhibit 4 at LMFIC 273-274; Exhibit 1, p. 99-104.

21.     On October 28, 2010, Vickerman spoke with Mr. Mays, who agreed to supply additional bids for electrical, mechanical, and plumbing.  Exhibit 4 at LMFIC 271.

22.     On November 12, 2010, Vickerman called Mr. Mays regarding the status of the bids for the HVAC units, roof, electrical, and plumbing.  Plaintiff Richard Mays agreed to supply the costs "next week."  Exhibit 4 at LMFIC 000269; Exhibit 1 at pp. 118-119.

23.     Vickerman called Mr. Mays again on November 22, 2010.  Mr. Mays promised to send the roofing cost but stated he did not have the electrical and HVAC bids ready.  Exhibit 4 at LMFIC 269; Exhibit 1 at pp. 121-124.

24.     The following day, November 23, 2010, Vickerman issued payment to Plaintiffs Mays for the damage to the Dwelling in the amount of $83,657.94.  Exhibit 4 at LMFIC 104; Exhibit 1 at pp. 122-124. This payment included extensive repairs to the residence for damages caused by the fire.  Exhibit 4 at pp. 114-126.

25.     Mr. Mays has testified that he has no issues or problems with this payment, or with any of the payments made on this claim.  Exhibit 1 at p. 181.

26.     On December 8, 2010, Vickerman called Mr. Mays, who stated framing was almost completed and he had discovered additional problems with the electrical system. Exhibit 4 at LMFIC 000267; Exhibit 1 at pp. 128-129.

27.     On January 10, 2011, Vickerman called Plaintiff Richard Mays to discuss the status of the repairs.  Exhibit 4 at LMFIC 266; Exhibit 1 at pp. 130-131.

28.     On January 12, 2011, February 14, 2011, February 25, 2011, and March 28, 2011, Vickerman called Mr. Mays to check on the status of repairs.  On all four occasions, Mr. Mays said "bad weather" had held up his progress.  Exhibit 4 at LMFIC 000266, 265, 000263; Exhibit 1 at pp. 131, 133-134, 138.

29.     On April 22 and May 18, 2011, Vickerman called Plaintiffs Mays regarding the repairs.  During the May 18 call, Mr. Mays indicated repairs were "almost completed" and agreed to supply bills.  Exhibit 4 at LMFIC 000261-262; Exhibit 1 at pp. 140-141.

30.     On July 21, 2011, Vickerman called Mr. Mays to follow up regarding the repairs and left a voicemail message.  Exhibit 4 at LMFIC 000260; Exhibit 1 at p. 143.

31.     On October 4, 2011, Vickerman called Mr. Mays.  Mr. Mays stated repairs were "almost completed."  Exhibit 4 at LMFIC 000259; Exhibit 1 at p. 145.

32.     On January 9, 2012, Vickerman called Mr. Mays regarding the status of the repairs.  Mr. Mays stated he was "almost complete" with the work other than painting and agreed to provide supplements.  Exhibit 4 at LMFIC 000257; Exhibit 1 at p. 149.

33.     On May 14, 2012, Vickerman called Mr. Mays, who stated he had discovered additional electrical and wiring damage.  Vickerman requested that Mr. Mays send him the information.  Exhibit 4 at LMFIC 000257; Exhibit 1 at pp. 150-151.

34.     On June 29, 2012, Vickerman called Mr. Mays regarding the status of repairs.  Mr. Mays stated that the repairs would be completed "in two weeks" and agreed to supply additional invoices.  Exhibit 4 at LMFIC 000256; Exhibit 1 at pp. 152-153.

35.     Adjuster Pablo Jimenez ("Jimenez") called Plaintiffs Mays and left messages on February 6, 2013, and March 4, 2013, indicating he needed to follow up on the supplemental estimates.  Exhibit 4 at LMFIC 000254.

36.     On April 5, 2013, Jimenez called Plaintiffs Mays and left a voicemail message explaining that he was closing the file.  Exhibit 4 at LMFIC 000254.

37.     Plaintiffs Mays never responded to Jimenez's telephone calls in February, March, or April of 2013.  Exhibit 6, Deposition of Pablo Jimenez, at p. 25.

*-Plaintiffs Mays' Personal Property Claim-*

38.     On or about October 25, 2010, Liberty Mutual issued Plaintiffs Mays a $500.00 advance for damaged contents.  Exhibit 4 at LMFIC 000185; Exhibit 1 at p. 106.

39.     Liberty Mutual also supplied Plaintiffs Mays with a blank "Proof of Loss" form.  Exhibit 4 at LMFIC 000191-193; *see also* Exhibit 1 at p. 106.

40.     On October 28, 2010, adjuster Roy Burns ("Burns") spoke to Mr. Mays and explained the process for obtaining payment for damaged or destroyed personal property. Exhibit 4 at LMFIC 270; Exhibit 1 at pp. 112-113.

41.     Liberty Mutual also sent Plaintiffs Mays a second check for $5,000.00 as an advance for Personal Property.  Exhibit 4 at LMFIC 000270; *see also* Exhibit 1 at p. 114.

42.     On November 9, 2010, Burns met with Plaintiffs Mays.  Mr. and Mrs. Mays indicated that Five Star Restoration had removed damaged and destroyed personal property and stated that Mrs. Mays was working on an inventory.  Plaintiffs Mays promised to send Burns the inventory.  Exhibit 4 at LMFIC 000269-270; Exhibit 2 at pp. 39-40.

43.     On December 14, 2010, Burns spoke with Mrs. Mays, who stated her daughter had almost completed an inventory.  Exhibit 4 at LMFIC 266; Exhibit 2 at p. 43.

44.     On March 25, 2011, adjuster Jacque Wilson ("Wilson") called Mr. Mays regarding the status of the inventory.  Exhibit 4 at LMFIC 000263.

45.     On April 15, 2011, Wilson again called Mr. Mays, who responded that they had "started" the inventory.  Exhibit 4 at LMFIC 000262; Exhibit 1 at pp. 139-140.

46.     Wilson also reached out to Five Star Restoration to inquire if they had an inventory, but was unsuccessful in obtaining the inventory.  Exhibit 4 at LMFIC 263, 262.

47.     On June 22, 2011, adjuster Dale Dickey ("Dickey") called Mrs. Mays regarding the inventory.  Mrs. Mays indicated her daughter was "almost done" with the list and agreed to finalize the list.  Exhibit 4 at LMFIC 000260; Exhibit 2 at pp. 45-46.

48.     Dickey called Plaintiffs Mays on July 8, July 11, and July 12, 2011, and left messages all three days asking Mrs. Mays if he could meet with her.  Mrs. Mays did not respond.  Exhibit 4 at LMFIC 000260; Exhibit 2 at pp. 46-47.

49.     On September 19, 2011, Brittany Higgins ("Higgins") called the Mays and stated she was the new Personal Property adjuster.  Exhibit 4 at LMFIC 259-260.

50.     During the September 19, 2011 telephone call, Higgins offered to meet and go over the items room-by room in order to prepare an inventory, and Mr. Mays asked her to call back that Friday to set up an appointment.  Exhibit 4 at LMFIC 000259-260.

51.     On September 23, 2011, Higgins called Mrs. Mays to set a meeting, and Mrs. Mays stated she would call back.  Exhibit 4 at LMFIC 259; Exhibit 2 at pp. 48-49.

52.     Higgins called on October 11, 2011, and left a message inquiring if Plaintiffs Mays were available that week to meet and prepare an inventory.  Exhibit 4 at LMFIC 259.

53.     On October 31, 2011, Higgins called and spoke with Mr. Mays to schedule an in-person meeting.  Mr. Mays stated "his wife has a list almost complete but hasn't priced it yet."  Higgins explained that she could price the items if she received a list.  Mr. Mays agreed to call her back.  Exhibit 4 at LMFIC 000258; Exhibit 1 at pp. 147-148.

54.     On December 12, 2011, and February 16, 2012, Higgins left voicemail messages asking about the inventory.  Exhibit 4 at LMFIC 257; Exhibit 1 at pp. 148-150.

55.    On June 25, 2012, Higgins spoke with Mrs. Mays, who said she did have a Personal Property Inventory but "keep[s] losing it."  Higgins provided her email address and asked Mrs. Mays to send the list.  Exhibit 4 at LMFIC 000256; Exhibit 2 at pp. 51-52.

56.    Mr. Mays admits he and Mrs. Mays lost their inventory.  Exhibit 1 at p. 152.

57.    On July 25, 2012, Higgins called Mrs. Mays and left a voicemail asking about the status of the inventory list.  Exhibit 4 at LMFIC 000256.

58.    On August 21, 2012, and September 18, 2012, Higgins called and left messages for Mr. and Mrs. Mays inquiring about the status of the inventory.  Exhibit 4 at LMFIC 000255; Exhibit 2 at pp. 53-54; Exhibit 7, Deposition of Brittany Higgins, at p. 26.

59.    On October 30, 2012, Higgins called and left Mrs. Mays a voicemail asking about the inventory, and stated that if she did not receive it within the next thirty (30) days, she would close the claim due to inactivity.  Exhibit 4 at LMFIC 255; Exhibit 7 at p. 26.

60.    On November 29, 2012, Higgins left messages for Mr. and Mrs. Mays and advised she never received an inventory.  Because the date of loss was over two years prior, Higgins stated she was closing the Personal Property claim.  Exhibit 4 at LMFIC 000255.

61.    On her November 29, 2012 voicemails, Higgins also provided her contact information.  Exhibit 4 at LMFIC 255.

62.    Higgins also sent Plaintiffs Mays a letter explaining that the Personal Property claim was being closed due to inactivity.  Exhibit 4 at LMFIC 000045.

63.    On November 29, 2012, Higgins closed the Personal Property claim.  Exhibit 4 at LMFIC 000254; Exhibit 7 at p. 27.

64.     Higgins testified that she never reviewed or saw any list of Personal Property from Plaintiffs Mays.  Exhibit 7 at p. 19.

65.     Plaintiff Richard Mays agrees that Higgins was responsive and diligent. Exhibit 1 at p. 146.

66.     Mr. Mays admits he did not supply a contents inventory to Liberty Mutual. Exhibit 1 at p. 137.

67.     Plaintiffs Mays admit that Defendant needed the Personal Property inventory in order to compensate them for Personal Property.  Exhibit 1 at p. 157; Exhibit 2 at p. 48.

### -Plaintiffs Mays' ALE Claim-

68.     The day of the fire, Liberty Mutual employee Josh Wilson arranged for ALE benefits for Mr. and Mrs. Mays.  Exhibit 4 at LMFIC 000274-275.

69.     Vickerman initially estimated the home would be uninhabitable for at least three (3) months while repairs were being completed.  Exhibit 4 at LMFIC 000272.

70.     On January 12, 2011, Mr. Mays requested a one-month extension of ALE due to weather, which Vickerman granted.  Exhibit 4 at LMFIC 266; Exhibit 1 at p. 131.

71.     On February 25, 2011, Mr. Mays requested a second one-month extension of ALE due to bad weather, which Vickerman allowed.  Exhibit 4 at LMFIC 000264-265; Exhibit 1 at p. 134.

72.     On March 28, 2011, Vickerman agreed to extend ALE to the end of April, at Mr. Mays' request.  Exhibit 4 at LMFIC 000263; Exhibit 1 at p. 138.

*-Plaintiffs Resurface Four Years Later-*

73.     The June 29, 2012, telephone call from Vickerman to Mr. Mays (Statement of Undisputed Facts ("SOF") ¶ 39) was the last time that any of Liberty Mutual's employees made contact with the Mays **for nearly four (4) years.**  Until February of 2016, Mr. and Mrs. Mays neither contacted Liberty Mutual nor responded to any of Liberty Mutual's communications.  *See, e.g.*, Exhibit 4 at LMFIC 000254-256; Exhibit 1 at p. 256.

74.     Mr. Mays admits that the four-year lapse in communications does not constitute compliance with his duties and obligations under the Policy.  Exhibit 1 at p. 156.

75.     On February 17, 2016, Mr. Mays called Liberty Mutual, spoke with Alfreda Farley ("Farley"), and demanded payment for supplemental receipts for additional work on the home.  Exhibit 4 at LMFIC 000254; Exhibit 1 at p. 166.

76.     Mr. Mays stated he had not supplied the invoices before because he "had a heart attack and a stroke."  Exhibit 4 at LMFIC 000254.

77.     Mr. Mays testified that these health issues occurred on March 22, 2013, December 20, 2013, and May 15, 2015.[3]  Exhibit 1 at p. 177.

78.     During this time period, Mrs. Mays was healthy and could have communicated with Liberty Mutual and supplied the information.  Exhibit 1 at p. 168.

79.     Mr. Mays did not ask his wife or his adult children to communicate with Liberty Mutual while he was ill.  Exhibit 1 at p. 170.

---

[3] Mr. Mays' health issues began twenty-nine (29) months after the fire.  As detailed below, Michael J. Berryman, a long-recognized expert in construction, concluded that repairs should have been completed (even if weather issues existed) no more than five (5) months from the date of the fire.  Exhibit 11, at p. 9.

80.     On April 15, 2016, Mr. Mays called and told Jimenez that he had sent in additional invoices, but did not remember where he mailed the documents and was unable to supply a tracking number.  Exhibit 4 at LMFIC 253-254; Exhibit 1 at pp. 170-171.

81.     Jimenez asked Mr. Mays to email the documents to adjuster Jason Larson ("Larson") and stated he could not confirm whether Liberty Mutual would pay the additional invoices due to the significant lapse in time.  Exhibit 4 at LMFIC 000253-254.

82.     Liberty Mutual finally received the additional Dwelling repair invoices from Mr. Mays in July or August of 2016.  *See, e.g.,* Exhibit 4 at LMFIC 000346.

83.     On August 9, 2016, Larson called Mr. Mays regarding the supplemental invoices and left a voicemail.  Exhibit 4 at LMFIC 000346.

84.     On August 15, 2016, Larson returned Mr. Mays' telephone call.  Mr. Mays stated he had retained counsel.  Exhibit 4 at LMFIC 000346.

85.     During the August 15 call, Larson asked Mr. Mays why it took him so long to send in the invoices.  Mr. Mays stated "he had a lot going on and sent them to the wrong address."  Exhibit 4 at LMFIC 000346.

86.     That same day, Larson called Plaintiffs' counsel and left a voicemail.  Exhibit 4 at LMFIC 000345.

87.     Plaintiffs' attorney Rachel Mor returned Larson's call the same day and stated that Plaintiffs had filed suit on August 9, 2016.  Exhibit 4 at LMFIC 000345.

88.     Mr. Mays has since claimed that he sent the invoices "sometime in 2013," but admits he has no evidence to support that assertion.  Exhibit 1 at p. 167.

*-Plaintiffs' Supplemental Dwelling Invoices-*

89.     In July or August of 2016, Defendant received seven (7) supplemental repair invoices from Mr. Mays.  Exhibit 1 p. 251; *see also* Exhibit 4 at LMFIC 000038-44.

90.     The first invoice, from Oklahoma Outdoor Solutions, totaled $4,597.16 for repairs to a sprinkler and electronic gate opener.  Exhibit 4 at LMFIC 38.  Mr. Mays claims the gate opener and sprinklers were somehow damaged by lightning.  Exhibit 1 at p. 188.

91.     The second invoice, from Card Garage Door, totaled $2,480.00 for repairs to three garage door openers.  Exhibit 4 at LMFIC 000039.  This invoice is for three jackshaft openers that are more expensive than traditional residential openers.  Exhibit 1 at p. 190. Mr. Mays admits these openers are uncommon and that he has no evidence that the same type of opener was installed in the home prior to the fire.  Exhibit 1 at pp. 192-193.

92.     The third invoice, from Cashion Home Improvements, totaled $733.00 for installing two new windows.  Exhibit 4 at LMFIC 000040.

93.     The fourth invoice, which states it is from "Mays Services," totaled $14,423.89 for wiring and cabling.   Exhibit 4 at LMFIC 000041.

94.     The fifth invoice, also prepared by "Mays Services," totaled $52,411.80 for removal and replacement of three HVAC systems.  Exhibit 4 at LMFIC 000042.

95.     The sixth invoice, again from "Mays Services," totaled $49,332.36 for electrical work.  Exhibit 4 at LMFIC 000043.

96.     The seventh and final invoice, also from "Mays Services," totaled $29,631.09 for plumbing repairs.  Exhibit 4 at LMFIC 000044.

*-Plaintiffs Mays' Supplemental Personal Property Invoices-*

97.     Prior to litigation, Plaintiffs **never** supplied Defendant with an inventory of destroyed Personal Property. *See* SOF at ¶ 69.

98.     On June 8, 2017, *after commencing this litigation*, Mr. and Mrs. Mays produced an inventory and receipts. Exhibit 8, Personal Property Inventory, Mays 22-47, 57-75, 90-98, 108-176, 198-211, 213-216; Exhibit 1 at p. 236; Exhibit 2 at pp. 43-45.

*-Plaintiffs' Credibility-*

99.     Mr. Mays did not obtain a building permit to restore the fire damages, and a final inspection has not occurred for the building, electrical, or plumbing permits. The City of Oklahoma City has not issued a Certificate of Occupancy, and the required HVAC permit is not on record. Exhibit 11, Expert Report of Michael J. Berryman, at p. 3.

100.    Mr. Mays claims he submitted the supplemental Dwelling "invoices" to Liberty Mutual in May and/or June of 2012. *See* Doc. No. 13 at p. 3; Exhibit 1 at p. 154. However, the serial number on Plaintiffs' HVAC unit demonstrates that this item was not even manufactured until **January of 2013**. Exhibit 11 at p. 8.

101.    In the Amended Complaint, Plaintiffs also claim that Mr. Mays communicated with individuals in a Liberty Mutual office located in Oklahoma City and supplied documents to those individuals. Doc. No. 13 at ¶¶ 19, 21, 23, 25, and 26.

102.    However, in his deposition, Mr. Mays denied ever communicating with or supplying documents to anyone in the Oklahoma City office:

Q (Mr. O'Connor):   Did you ever deliver any documents to any Oklahoma office of Liberty Mutual?
A (Mr. Mays):       I didn't hand-deliver anything.

17

. . .

Q:          And you don't remember talking to anybody specifically in a
            Liberty Mutual Oklahoma office; right?
A:          No. . . .  Exhibit 1, at pp. 178-79.

103.    Plaintiffs have disclosed multiple individuals as having relevant information.

*See* Plaintiffs' Final Witness and Exhibit List, Doc. No. 37. When subpoenaed, those

individuals were unable to supply any relevant or helpful information.[4]  *See* Exhibit 13.

### *-Plaintiffs Mays' Allegations of "Bad Faith"-*

104.    When asked what Liberty Mutual did wrong on this claim, Mr. Mays

responded "I can't answer that right now."  Exhibit 1 at p. 254.

105.    When asked whether Liberty Mutual treated him fairly and in good faith, Mr.

Mays stated, "Well, during the claim process, I would say everything went about the way

it should have ran [sic] its course. . . ."  Exhibit 1 at pp. 259-260.

106.    Mr. Mays agrees that two people could reasonably reach different

conclusions on the value of a claim and on the source of damage.  Exhibit 1 at p. 265.

107.    When asked what Liberty Mutual did wrong, Mrs. Mays stated,

I think there's a lot of people involved, and sometimes when we would try to
contact people, they didn't work there anymore, or they would give you to
other people.  It would be nice if there was one person that, you know, was
kind of in charge.

Exhibit 2 at p. 60.

---

[4] As shown in Exhibit 13, William Murray had no information to produce, nor did James
Lester.  Vets Septic Service supplied documents that pre-date the fire by several months
and, therefore, are not relevant.  The invoice from Troxel Construction is undated and, yet
again, provides no relevant source documents.

108.    However, Mrs. Mays did not dispute that Liberty Mutual employees called her many times and were not able to reach her.  Exhibit 2 at p. 63.

109.    Mrs. Mays also admits that she never advised Liberty Mutual that she was unhappy with the number of people on the claim.  Exhibit 2 at p. 65.

110.    Mrs. Mays also expressed dissatisfaction with "the amount of money that was paid to Five Star" Restoration.  Exhibit 2 at p. 61.

111.    Mrs. Mays admits that she did not know how much Liberty Mutual paid Five Star and she did not express that concern to Liberty Mutual.  Exhibit 2 at pp. 63-65.

112.    Mrs. Mays had no other problems with this claim.  Exhibit 2 at p. 69.

113.    When asked what damages she is seeking, Mrs. Mays stated,

I don't know what numbers, I don't know—I don't know.  I'm just not involved in it.  We are—you don't know us.  We are very old-fashioned.  He takes care of this, I take care of the laundry and the kids and the food.  I don't know, really, anything about—I can't dispute this stuff . . . .

Exhibit 2 at p. 69.

### *-Defendant's Claims Handling Expert Diane Luther-*

114.    On May 11, 2018, Liberty Mutual supplied the expert report of its claims handling expert, Diane Luther ("Luther").  Exhibit 9, Diane Luther Expert Report.

115.    Luther opines that during her 20 years of handling property claims and 20 subsequent years as a consultant, she has never seen a claim where an insured or family member did not correspond with the insurer for four (4) years.  Exhibit 9, at p. 3.

116.    Luther opines that the Policy requirements of cooperation, providing an inventory, making the property available for inspection, and providing a Proof of Loss

ensure that neither the insured nor the insurer is prejudiced by an inability to gather and verify damage or loss.  Luther adds that as more time goes by, performing these essential components of adjustment becomes more difficult, if not impossible.  Exhibit 9, at p. 3.

117.    Ms. Luther opines that it is the insured's responsibility to prove that items were damaged.  Exhibit 9 at p. 3.

118.    Ms. Luther further states, "I do not know how Liberty Mutual can verify the personal property loss at this point.  It seems that the Mays expect Liberty Mutual to take their word for it after failing to comply with numerous requests by Liberty Mutual to participate in gathering and verifying the information."  Exhibit 9 at p. 3.

119.    Luther states, "Based on my training and experience, I do not know what additional steps Liberty Mutual could have done to gather and verify the information it needed . . . ."  Exhibit 9 at p. 4.

120.    Luther goes on to state, "I believe the Liberty Mutual claims handling in this matter was consistent with acceptable insurance industry standards.  Indeed, I am doubtful most insurance companies would have been as patient.  Any delays or prejudice claimed by the Mays lies squarely at their feet for failing to cooperate."  Exhibit 9 at p. 4.

121.    Luther adds,

Mr. Mays apparently has a successful business.  A thoughtful and legitimate business would not expect to remain in business if it did not contact its clients, return phone calls, or communicate with reasonable requests for four years.  I believe it is ridiculous for the Mays to allege Liberty Mutual acted in bad faith toward them when they refused to cooperate with Liberty Mutual as required by the insurance contract.

Exhibit 9 at p. 4.

122.    Luther also points out that Mr. and Mrs. Mays requested three thirty-day extensions on ALE coverage in 2011 due to bad weather delaying repairs.  Exhibit 9 at p. 2.  Luther notes that based on available data, at no time during the requested extensions was there any weather that would require the halting of construction.  Exhibit 9 at p. 2.

123.    Luther also testified that the repairs should have been finished long before Mr. Mays' health issues arose.  Exhibit 10, Deposition of Diane Luther, at pp. 49-51.

124.    Plaintiffs have not retained a claims handling expert.  *See* Doc. No. 36, Plaintiffs' Expert Witness List.

***-Defendant's Construction and Damages Expert, Michael J. Berryman-***

125.    On May 11, 2018, Liberty Mutual supplied the report of its expert, Michael J. Berryman ("Berryman").  Exhibit 11.

126.    Berryman opines that Mr. Mays failed to follow common practices in documenting the scope and pricing of open items and failed to properly notify Liberty Mutual of additional damages.  Exhibit 11 at pp. 6-10.

127.    Berryman also states that many of the invoices supplied by Mr. Mays go beyond the scope of the damages.  In some cases, pricing is excessive and above industry standard.  Exhibit 11 at pp. 9-12.

128.    Berryman further indicates that Liberty Mutual followed industry standard methods in its determination of the proper cost to restore the damage to the dwelling.  The Liberty Mutual estimate expresses a scope of work that reasonably addresses the necessary repairs that were observable at the time of the inspection.  Exhibit 11 at p. 12.

129.    Berryman testified:

> [I]f you examine the invoices carefully, you see that there's a wide mixture of work, scope items and costs that had nothing to do with the fire restoration. They go well beyond what was required to restore this fire [loss].  And then Mr. Mays says, here are my costs, that should be recognized.  I think it's important to realize that those costs are contaminated with both, what it might take to do a fire restoration, but also what it took to remodel this entire house.

Exhibit 12, Deposition of Mike Berryman, at pp. 24-25.

130.   Berryman further testified:

> [T]he typical process that we see, that Mr. Mays did not follow, was to document the costs all along and to make those available in a timely manner. He failed to do that.

Exhibit 12 at p. 26.

131.   Berryman concluded that all repairs related to the fire should have been completed within five months from the date of the fire.  Exhibit 11 at p. 9.

132.   Berryman testified that Mr. Mays had no source documents supportive of his invoices, such as timecards or invoices for piping or duct work.  Exhibit 12 at p. 27.

133.   Berryman testified that as a licensed contractor, Mr. Mays should have known the cost of the HVAC replacement early in the process.  Exhibit 12 at p. 28

134.   Plaintiffs have not retained an expert witness regarding construction and/or Plaintiffs' claimed damages.  *See* Doc. No. 36, Plaintiffs' Expert Witness List.

## SUMMARY JUDGMENT STANDARD

A motion for summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a).  Federal Rule of Civil Procedure 56(a) "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party

who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Bennett v. Windstream Commc'ns, Inc.*, 30 F. Supp. 3d 1243, 1252 (N.D. Okla. 2014) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)); *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998). When the moving party has carried its burden, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts . . . Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Bennett*, 30 F. Supp. 3d at 1252-53 (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)) (citations omitted).

"An issue is 'genuine' if there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way. . . . An issue of fact is 'material' if under the substantive law it is essential to the proper disposition of the claim." *Bennett*, 30 F. Supp. 3d at 1253 (citing *Adler*, 144 F.3d at 670) (citations omitted). In essence, the inquiry for the court is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Bennett*, 30 F. Supp. 3d at 1253 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52, (1986)). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the [trier of fact] could reasonably find for the plaintiff." *Bennett*, 30 F. Supp. 3d at 1253 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252(1986)). Liberty Mutual respectfully submits that the record evidence in this case supports the entry of summary judgment.

## ARGUMENT AND AUTHORITY

**I.      Plaintiffs Mays' Claim for Breach of Contract Should be Disposed of by Summary Judgment as This Claim is Time-Barred and Without Merit.**

Liberty Mutual submits that Plaintiffs Mays' claim for breach of contract should be disposed of by summary judgment as this claim is time-barred and substantively meritless.

### A.      Plaintiffs' Mays Claim for Breach of Contract is Time-Barred.

Liberty Mutual respectfully submits that Plaintiffs Mays' breach of contract claim is time-barred pursuant to the subject Policy and Oklahoma law.  Plaintiffs Mays' Policy contains a one-year limitations period running from the date of loss.  SOF at ¶ 5.[5]  This policy language accords with Oklahoma law.  *See* OKLA. STAT. tit. 36, § 4803 (the Oklahoma statutory form for fire insurance policies includes a twelve-month limitations period); *Wagnon v. State Farm Fire & Cas. Co.*, 1997 OK 160, ¶ 6 ("a fire policy, being property insurance, can be limited to a one-year period in which to file an action.").

This Court has held in accord.  *Caton v. State Farm Fire & Cas. Co.,* No. CIV-06-1112-F, 2007 WL 2993869, *5 (W.D. Okla. Sept. 19, 2007) ("the one-year limitation period for filing suit against defendant began to run on the date that plaintiff's residence was damaged by fire . . . . [P]laintiff's breach of contract claim is barred due to plaintiff's failure to commence suit on the claim within one year of the date of loss or damage"); *Hayes v. State Farm Fire & Cas. Co.*, 855 F. Supp. 2d 1291, 1301 (W.D. Okla. Jan. 24, 2012) (where a lawsuit was not filed within one year after the date of loss, the one-year

---

[5] Each time their Policy was renewed, Mr. and Mrs. Mays received a copy and had an opportunity to review it.  SOF at ¶ 3.

limitations period in the policy operated to bar the plaintiff's breach of contract claim).

Similarly, in *Breedlove v. Allstate Ins. Co*., the plaintiff's residence was destroyed by fire on December 6, 1998.  73 Fed. Appx. 377 (10th Cir. Okla. Aug. 22, 2003).  The insurer denied the claim on October 27, 1999, and the plaintiff did not file suit against her insurer until December 1, 2000.  *Id.* at 378.  The district court held that the plaintiff's breach of contract claim was barred by a one-year limitations period in the policy.  *Id.* at 378-79.  The Tenth Circuit affirmed this holding.  *Id.* at 379.

Here, the lightning strike and subsequent fire which damaged Plaintiffs Mays' residence occurred on October 22, 2010.  SOF at ¶ 8.  Mr. and Mrs. Mays admit that the Policy contains a one-year limitations period that runs from the date of loss.  SOF at ¶ 5.  Yet, Plaintiffs did not file suit against Defendant until August 9, 2016—nearly **six years** after the date of loss.  Doc. No. 1, at Exhibit 2.  Based on these facts, Plaintiffs' claims are plainly time-barred by the limitations period contained in the Policy.

Nor have Plaintiffs supplied any evidence that this contractual limitations period was somehow "tolled."  On the contrary, Mr. Mays testified that no one at Liberty Mutual ever told him that the limitation period was waived or did not apply.  SOF at ¶ 6.  Mr. Mays testified that no one at Liberty Mutual ever told the Mays that the claim would be paid regardless of how long it took to submit invoices and inventories to Liberty Mutual.  SOF at ¶ 7.  Indeed, any delays were certainly the result of Mr. and Mrs. Mays' conduct.  During the pendency of the claim, Mr. and Mrs. Mays refused to answer or respond to communications from Liberty Mutual for a period of approximately **four (4) years**.  SOF at ¶ 73.  Mr. Mays admits that Plaintiffs Mays' behavior in this respect was in derogation

of the duty to cooperate under the Policy.   SOF at ¶ 74.   Therefore, Liberty Mutual respectfully submits that Plaintiffs Mays' claim for breach of contract is time-barred.

**B.      Plaintiffs' Mays Claim for Breach of Contract is Substantively Meritless.**

Liberty Mutual respectfully submits that Plaintiffs Mays' claim for breach of contract is also substantively meritless.   To recover on a breach of contract theory, Plaintiffs Mays must prove (1) formation of a contract; (2) breach of the contract; and (3) damages as a direct result of the alleged breach.   *Digital Design Grp., Inc. v. Info. Builders, Inc.*, 2001 OK 21, ¶ 33, 24 P.3d 834, 843.   There are no facts which support a breach of contract claim on any aspect of Plaintiffs' insurance claim.

**i.      Summary Judgment on Plaintiffs Mays' Dwelling Claim is Appropriate.**

Summary judgment on Plaintiffs Mays' Dwelling claim is appropriate.   Liberty Mutual promptly inspected Plaintiffs' residence and issued payment of $83,675.94 in Dwelling benefits.   SOF at ¶¶ 20, 24.   Mr. Mays has no issues or problems with this payment. SOF at ¶ 25.   At the time, Mr. Mays indicated he would supply bids for additional line-items with respect to the home's electrical, mechanical, and plumbing systems.[6]   *See, e.g.,* SOF at ¶ 21.   Liberty Mutual's employees unsuccessfully attempted to contact Plaintiffs on **nineteen (19) occasions** to obtain the promised bids, but received no responsive documents for **four (4) years**.   SOF at ¶¶ 21-23, 26-36, 73.   Plaintiffs Mays not only failed to supply the requested additional bids within the one-year period outlined in

---

[6] Mr. and Mrs. Mays agree that their duties under the Policy include the duty to provide Liberty Mutual with the records and documents that it requests.   SOF at ¶ 4.   Mr. Mays further testified that through his work, he timely submits invoices.   SOF at ¶ 15.

the contract (*see* SOF at ¶ 5), but in fact failed to supply the requested information to Liberty Mutual until mid-2016, nearly **six (6) years** after the date of loss.[7]  SOF at ¶¶ 82, 89-96.   Mr. Mays admits that his four-year lapse in communications with Liberty Mutual does not constitute compliance with his duties under the Policy.  SOF at ¶ 74.

In addition to being untimely, the additional repair invoices are objectionable for a host of other reasons, as well.  *See* SOF at ¶¶ 126-133; Exhibit 11.  Liberty Mutual's construction and damages expert, Michael J. Berryman, has opined that Mr. Mays failed to follow common practices in documenting the scope and pricing of open items and failed to properly notify Liberty Mutual of additional damages.  SOF at ¶ 126.  As detailed in Berryman's report, the invoices supplied by Mr. Mays go beyond the scope of the documented damages and contain pricing that is excessive, above industry standards, and not related to the fire.[8]  SOF at ¶ 127.  In contrast, Berryman opines that Liberty Mutual followed industry standards in determining the proper cost of repairs and that Liberty Mutual's estimate expresses a scope of work that reasonably addresses the repairs that were observable at the time of the inspection.  SOF at ¶ 128.  Plaintiffs have not retained an expert witness, nor have they supplied any evidence whatsoever controverting Berryman's conclusions.  SOF at ¶ 134.  As such, summary judgment on the Dwelling claim is proper.

---

[7] Plaintiff contends he supplied the invoices to Liberty Mutual in 2012.  However, Mr. Mays admits he has no evidence to support this assertion.  SOF at ¶ 88, 80.  Moreover, the serial number of Plaintiffs' HVAC units contradict this statement.  Exhibit 11, at p. 8.

[8] It is also noteworthy that when the fire occurred, Mr. Mays was in the process of completing extensive remodeling to the subject residence.  SOF at ¶¶ 16-17.

ii.     **Summary Judgment on the Personal Property Claim is Appropriate.**

Summary judgment on the Personal Property claim is appropriate. Liberty Mutual promptly issued Mr. and Mrs. Mays two Personal Property advances totaling $5,500.00, supplied them with a blank "Proof of Loss" form, and explained the process for obtaining reimbursement for personal property.  SOF at ¶¶ 38-41.  **Prior to litigation, Plaintiffs Mays never supplied an inventory of damaged or destroyed Personal Property**.[9]  *See* SOF at ¶¶ 64, 66, 97, 98.  Despite repeated assurances that they were preparing the inventory (SOF at ¶¶ 42, 43, 45, 47, 53, 55) Plaintiffs did not supply an inventory until June 8, 2017, nearly seven (7) years after the fire and well after filing suit.  SOF at ¶¶ 64, 66, 97, 98.  Liberty Mutual's expert, Diane Luther, opines it is the insured's responsibility to prove that the items were damaged, and it is not feasible for Liberty Mutual to verify the Personal Property loss at this late date.  SOF at ¶¶ 116, 117.  Mr. and Mrs. Mays do not have a claims handling expert and have not controverted Luther's assertions in this regard. As such, summary judgment on the Personal Property claim is proper.

iii.    **Summary Judgment on Plaintiffs Mays' ALE Claim is Appropriate.**

Summary judgment on Plaintiffs Mays' ALE claim is appropriate.  Liberty Mutual promptly set up ALE coverage and granted every ALE extension that Mr. and Mrs. Mays requested.  SOF at ¶¶ 9, 68-72.  Liberty Mutual has never denied any ALE benefits.  *See id.*  Liberty Mutual has not breached the contract of insurance with respect to ALE benefits.

---

[9] Mr. and Mrs. Mays agree that they have duties under the Policy to prepare an inventory of damaged personal property and to attach related documents and to provide a signed and sworn Proof of Loss within sixty (60) days after a request by Liberty Mutual.  SOF at ¶ 4.

*See, e.g., Butterfly-Biles v. State Farm Life Ins. Co.*, No. 09-CV-086-CVE-PJC, 2010 WL 346839, *5 (N.D. Okla. Jan. 21, 2010) ("Because it has not refused to pay benefits, State Farm cannot be liable for breach of contract.").

## II.   Summary Judgment on Plaintiffs Mays' Claim for Breach of the Duty of Good Faith and Fair Dealing is Proper as This Claim is Also Time-Barred and Unsupported by the Record Evidence.

Liberty Mutual respectfully submits that summary judgment is proper on Plaintiffs' Mays bad faith claim, as this claim is time-barred and unsupported by the record evidence.

### A.   Plaintiffs Mays' Bad Faith Claim is Time-Barred.

Liberty Mutual respectfully submits that summary judgment is appropriate as Plaintiffs Mays' claim for breach of the duty of good faith and fair dealing is time-barred. In Oklahoma, the statute of limitations for a bad faith claim is two years. *See* OKLA. STAT. tit. 12, § 95(3); *see also Miller v. Liberty Mut. Fire Ins. Co.*, 2008 OK CIV APP 65, 191 P. 3d 1221, 1227. Here, Mr. and Mrs. Mays' fire loss occurred on October 22, 2010. Doc. No. 13, Amended Complaint, at ¶ 8; *see also* SOF at ¶ 8. Yet, Plaintiffs did not file suit until nearly **six years** after the loss, on August 9, 2016.[10] Doc. No. 1, at Exhibit 2. Therefore, Plaintiffs Mays' bad faith claim is plainly time-barred.[11]

---

[10] This Court has previously held that Plaintiffs Mays' claim accrued on May 12, 2013. Doc. No. 12 at p. 5.

[11] *See, e.g., Blue v. Universal Underwriters Life Ins. Co.*, 612 F. Supp. 2d 1201, 1203 (N.D. Okla. Mar. 18, 2009) (holding "Plaintiff's bad faith cause of action arose on December 31, 2003, when her claim was denied. Plaintiff did not file the instant case until June 26, 2008—more than two years after the event. Therefore, Plaintiff's bad faith claim fails as a matter of law because it is outside the statutory limitations period" and granting summary judgment on the bad faith claim); *Trinity Baptist Church v. GuideOne Elite Ins. Co.*, 654 F. Supp. 2d 1316, 1325-27 (W.D. Okla. Aug. 28, 2009) (holding plaintiff's bad faith claim was time-barred where the relevant facts occurred before August 2004 and suit was

## B.     Plaintiffs Mays' Have Presented No Evidence that Liberty Mutual Acted in Bad Faith.

Liberty Mutual respectfully submits that Plaintiffs Mays' bad faith claim is also fundamentally flawed as Plaintiffs Mays have presented no evidence of bad faith.   To establish a prima facie case against an insurer for bad faith, a plaintiff must show:

> 1) the insurer was required under the insurance policy to pay the insured's claim; 2) the insurer's refusal to pay the claim in full was unreasonable under the circumstances because either: a) it had no reasonable basis for the refusal, b) it did not perform a proper investigation of the claim, or c) it did not evaluate the results of the investigation properly; 3) the insurer did not deal fairly and in good faith with the insured; and 4) the insurer's violation of its duty of good faith and fair dealing was the direct cause of the injury sustained by the insured.

*Andres v. Okla. Farm Bureau Mut. Ins. Co.*, 2009 OK CIV APP 97, ¶ 16, 227 P.3d 1102, 1107.  Plaintiff has the burden of proof.  *McCorkle v. Great Atlantic Ins. Co.*, 1981 OK 128, ¶ 20, 637 P.2d 583, 587.  Here, as discussed above in relation to the breach of contract claim, Plaintiffs have presented no evidence supporting the first element of a bad faith claim, that Liberty Mutual was required to pay the claim.  *See supra* Section I(B).   Nor have Plaintiffs Mays presented any evidence supporting the third element of a bad faith

---

commenced on August 25, 2006 and partially granting summary judgment on the bad faith claim); *Ryals v. State Farm & Cas. Co.*, No. 08-CV-91-JHP-FHM, 2008 WL 4542886, *2-3 (N.D. Okla. Oct. 7, 2008) (granting summary judgment where the plaintiffs filed suit more than two years after all relevant claims events, noting the statute of limitations was not tolled simply because the plaintiffs "negligently refrain[ed]" from pursuing claims for breach of contract and bad faith); *Tomlinson v. Combined Underwriters Life Ins. Co.*, No. 08-CV-259-TCK-FHM, 2009 U.S. Dist. LEXIS 81897, *4-6, 12 (N.D. Okla. Sept. 9, 2009) (granting an insurer's motion to dismiss a plaintiff's bad faith claim where the alleged wrongful acts occurred between October 7, 2004 and December 29, 2005, and the plaintiff did not add the insurer as a party until July 30, 2008, nearly three years later).

claim, that Liberty Mutual did not deal fairly and in good faith with Mr. and Mrs. Mays.

Indeed, Mr. and Mrs. Mays' own testimony establishes the lack of support for their "claim" for bad faith. When asked what Defendant did wrong, Mr. Mays responded "I can't answer that right now." SOF at ¶ 104. When asked whether Liberty Mutual treated him fairly and in good faith, Mr. Mays stated, "Well, during the claim process, I would say everything went about the way it should have ran [sic] its course. . . ." SOF at ¶ 105. Mr. Mays agrees that two people could reasonably reach different conclusions on the value of a claim and on the source of damage. SOF at ¶ 106. When asked what Liberty Mutual did wrong, Mrs. Mays took issue with the number of people involved on the claim. SOF at ¶ 107. However, she did not dispute that Liberty Mutual employees called her many times and were not able to reach her and also admitted that she never advised Liberty Mutual that she was unhappy with the number of adjusters. SOF at ¶¶ 108-109. Mrs. Mays also expressed dissatisfaction with "the amount of money that was paid to Five Star [Restoration]" but admitted she is unaware of that amount paid and further admitted that she did not express this concern to Liberty Mutual. SOF at ¶¶ 110-111. Mrs. Mays had no other problems with how this claim was handled, and could identify no damages that she and Mr. Mays have sustained. SOF at ¶¶ 112, 113. Plainly, Plaintiffs Mays have presented no evidence of "bad faith" by Liberty Mutual. Liberty Mutual respectfully submits that summary judgment is appropriate on Mr. and Mrs. Mays' bad faith claim.

### C. Plaintiffs' Bad Faith Claim is Unsupportable Because Liberty Mutual Acted Reasonably.

Relatedly, Plaintiffs Mays' bad faith claim is fundamentally flawed, as Liberty

Mutual acted reasonably.  The second necessary element of bad faith is that "the insurer's refusal to pay the claim in full was unreasonable under the circumstances because either: a) it had no reasonable basis for the refusal, b) it did not perform a proper investigation of the claim, or c) it did not evaluate the results of the investigation property."  *Andres*, 2009 OK CIV APP 97 at ¶ 16.   "'Where an insurer has demonstrated a reasonable basis for its actions, bad faith cannot exist as a matter of law,' and the insurer is entitled to summary judgment."  *Dunbar v. State Farm Mut. Auto. Ins. Co.*, No. 10-CV-330-GKF-TLW, 2011 WL 5878383, *7 (N.D. Okla. Nov. 23, 2011) (quoting *Beers v. Hillory*, 2010 OK CIV APP 99, ¶ 26, 241 P.3d 285, 293).

Here, the record evidence demonstrates that Liberty Mutual acted reasonably in the handling of Plaintiffs Mays' insurance claim.  With respect to the Dwelling exposure, Liberty Mutual's adjusters promptly inspected the residence and issued an initial payment of $83,657.94.  SOF at ¶¶ 20, 24.  Mr. Mays testified that he had no issues or problems with Dwelling adjuster Michael Vickerman, with this Dwelling payment, or with any payments on this claim.  SOF at ¶¶ 19, 25.  Mr. Mays promised to supply additional bids for electrical, mechanical, and plumbing line-items.  SOF at ¶ 21.  Liberty Mutual's employees contacted Plaintiffs on **nineteen (19) occasions** to obtain such bids, but received no responsive for approximately **four (4) years**.  SOF at ¶¶ 21-23, 26-36, 73.  Plainly, Liberty Mutual acted reasonably in the handling of the Dwelling claim, and the four-year delay was caused solely by Plaintiffs Mays.

Likewise, regarding the Personal Property claim, Liberty Mutual promptly issued two advances of $500.00 and $5,000.00, supplied a blank "Proof of Loss" form, and

explained the process for obtaining reimbursement.  SOF at ¶¶ 38-41.  Liberty Mutual's adjusters contacted Plaintiffs Mays at least twenty-one (21) times regarding the status of the claim, and even offered to assist with preparing an inventory in-person at the residence. SOF at ¶¶ 42-62.  Despite repeated assurances they were preparing the inventory (SOF at ¶¶ 42, 43, 45, 47, 53, 55), Plaintiffs did not supply an inventory until June 8, 2017, nearly seven (7) years after the fire and well after filing this lawsuit.  SOF at ¶¶ 64, 66, 97, 98. Mr. Mays agrees that Liberty Mutual's adjuster, Brittany Higgins, was responsive and diligent, and that Liberty Mutual needed the inventory in order to compensate Plaintiffs Mays for damaged or destroyed Personal Property.  SOF at ¶¶ 65, 67.  Additionally, with respect to ALE, Liberty Mutual promptly set up Plaintiffs Mays' alternative living site. SOF at ¶ 9.  Liberty Mutual paid for Plaintiffs to reside at an alternate location for six (6) months, through the end of April 2011.  SOF at ¶¶ 68-72.  Liberty Mutual acted reasonably in the handling of Plaintiffs Mays' claim for Personal Property and ALE benefits.

Indeed, Liberty Mutual's claims handling expert, Diane Luther, opines that she has never before seen a claim where an insured or family member did not correspond with the insurer for four (4) years.  SOF at ¶ 115.  Luther adds that the purpose of Policy requirements of cooperation, providing an inventory, and providing a Proof of Loss ensure that neither the insured or insurer is prejudiced by an inability to gather evidence and verify the loss.  SOF at ¶ 116.  As more time goes by, performing these essential components of adjustment becomes more difficult, if not impossible.  *Id.*  Luther further opines that based on her extensive training and experience, she does not know what additional steps Liberty Mutual could have taken to gather and verify the information it needed.  SOF at ¶ 119.

Luther states that Liberty Mutual's claims handling was consistent with acceptable industry standards.  SOF at ¶ 120.  Plaintiffs, and not Liberty Mutual, are solely responsible for the significant delays on this claim.  *Id.*  Liberty Mutual respectfully submits it acted reasonably and appropriately, and summary judgment on the bad faith claim is proper.

### D.   Liberty Mutual's Conduct Was Not the Direct Cause of Injury.

Plaintiffs Mays' bad faith claim also fails on grounds that Liberty Mutual's conduct was not the direct cause of their alleged injury.  Where "there is no competent evidence from which a jury could reasonably find a causal nexus between the act(s) or omission(s) deemed tortious and the injury," the question of proximate cause may be determined by the Court.  *Gillham v. Lake Country Raceway*, 2001 OK 41, ¶ 7, 24 P.3d 858, 860.  It is undisputed that the damage to Mr. and Mrs. Mays' home was caused by a lightning strike, and not by Liberty Mutual's conduct.  SOF at ¶ 8.  Liberty Mutual promptly issued payment for all damages timely presented by Plaintiffs Mays.  Any alleged delay or prejudice lies squarely with Mr. and Mrs. Mays for failing to cooperate with Liberty Mutual.  *See* SOF at ¶ 120.  There has been no breach of contract and no bad faith.  Liberty Mutual respectfully submits summary judgment on the bad faith claim is appropriate.

### III.   Plaintiff Mays Service's "Claim" for Breach of Contract Should be Disposed of by Summary Judgment as Such Claim is Time-Barred and Plaintiff Mays Service Never Entered Into a Contract With Defendant.

Liberty Mutual respectfully submits that Plaintiff Mays Service's "claim" for breach of contract should be disposed of by summary judgment as this claim is time-barred and Plaintiff Mays Service never entered into a contract with Defendant.

### A.      Plaintiff Mays Service's Breach of Contract "Claim" is Time-Barred.

As with Mr. and Mrs. Mays breach of contract claim, Mays Service's breach of contract claim is time-barred by the Policy's one-year limitations period.  *See supra* Section I(A).  Therefore, Liberty Mutual respectfully submits summary judgment is appropriate.

### B.      Mays Service Never Entered Into a Contract with Liberty Mutual.

Plaintiff Mays Service's claim for breach of contract is also without merit as Mays Service never entered into a contract with Liberty Mutual.  The threshold element of a claim for breach of contract is formation of a contract.  *Digital Design Group, Inc.*, 24 P.3d at 843.  Plaintiff Mays Service cannot show that it formed a contract with Liberty Mutual. Mr. Mays testified that he incorporated "Mays Service Inc." in January of 2014.  SOF at ¶ 12.  Plainly, Mays Service could not have entered into a contract with Liberty Mutual to perform the needed repairs to the subject residence, as it did not exist when the October 2010 fire occurred or when repairs commenced.  SOF at ¶¶ 8, 26.  Regardless, there was never a contract in place between Liberty Mutual and Mays Service.  Plaintiffs have never presented any evidence of an agreement between Liberty Mutual and Mays Service.  The only contract at issue here is the Mays' Policy with Liberty Mutual.  SOF at ¶¶ 1-2.  Thus, summary judgment is appropriate on Mays Service's "claim" for breach of contract.

## IV.    Liberty Mutual Respectfully Seeks Summary Judgment on the Issue of Punitive Damages.

Plaintiffs Mays seek an award of punitive damages.  As discussed above, there is no basis for an award of contract or bad faith damages against Liberty Mutual.  However, alternatively, there is certainly no support for the punitive damages claim to survive.  *Willis*

*v. Midland Risk Ins. Co.*, 42 F.3d 607, 614-15 (10th Cir. 1994) (citing *McLaughlin v. National Benefit Life Ins. Co.*, 772 P.2d 383, 385, 387, 389 (Okla. 1988)). Punitive damages do not, ipso facto, follow from every alleged breach of the duty of good faith and fair dealing. *Willis*, 42 F.3d at 615 (citing *McLaughlin*, 772 P.2d at 385). Under Oklahoma law, punitive damages may be awarded against an insurer for breach of the duty of good faith and fair dealing only if the insurer has acted in reckless disregard of its duty, or if the insurer breached its duty intentionally and with malice. OKLA. STAT. tit. 23, § 9.1(B)-(D). Here, there is insufficient evidence to support the submission of punitive damages to a jury.

**Plaintiffs Mays have not presented any evidence of acts which were intentionally wrongful or reckless.** Plaintiffs Mays expressed satisfaction with the adjusters assigned to their claim. *See* SOF at ¶¶ 19, 65. Plaintiffs Mays had difficulty articulating anything Liberty Mutual did wrong or explaining their claimed damages. *See* SOF at ¶¶ 104-113. As discussed above, Plaintiffs' allegations do not support a bad faith claim. Accordingly, Plaintiffs Mays cannot recover punitive damages.[12] As such, Liberty Mutual respectfully submits summary judgment on this issue is proper.

## CONCLUSION

Defendant Liberty Mutual Fire Insurance Company respectfully requests that the Court enter judgment as a matter of law on Plaintiffs' claims.

---

[12] *See Rodebush v. Okla. Nursing Homes*, 1993 OK 160, 867 P.2d 1241, 1247 ("The plea for punitive damages rests on the underlying claim, and if there is no recovery on the underlying claim, there can be no recovery of punitive damages."). "In the absence of a showing of [the requisite conduct for punitive damages], it would be improper to submit the issue of punitive damages to the jury." *Willis*, 42 F.3d at 615 (citations omitted).

Dated:        October 1, 2018                    Respectfully submitted,

**HALL, ESTILL, HARDWICK,
GABLE, GOLDEN & NELSON, P.C.**

By:    _s/William W. O'Connor_
       William W. O'Connor, OBA No. 13200
       Margo E. Shipley, OBA No. 32118
       320 South Boston Avenue, Suite 200
       Tulsa, OK  74103-3706
       Telephone:  (918) 594-0400
       Facsimile:  (918) 594-0505
       Email: boconnor@hallestill.com
       Email: mshipley@hallestill.com

**ATTORNEYS FOR DEFENDANT,
LIBERTY MUTUAL FIRE
INSURANCE COMPANY**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 1st day of October, 2018, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following:

Rachel Lawrence Mor
Dan M. Peters

**ATTORNEYS FOR PLAINTIFFS**

*s/William W. O'Connor*
William W. O'Connor